UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

UNITED STATES,

                       Plaintiff,

v.

THOMAS B. ZOMBORY,

                      Defendant.

12-cr-00717 (KM)

OPINION

## KEVIN MCNULTY, U.S.D.J.

The defendant, Thomas Zombory, was convicted of one misdemeanor offense of public lewdness, in violation of 36 C.F.R. § 7.29(c). The offense was tried before a federal Magistrate Judge because it occurred at Sandy Hook, a federal enclave that is part of the Gateway National Recreation Area. *See* 18 U.S.C. § 13; *United States v. Hall*, 979 F.2d 320 (3d Cir. 1992). The area where the offense occurred is a clothing-optional beach. There is no contention that nudity as such would constitute any sort of violation. On the other hand, no party contends that the authorities, having accommodated sunbathers that far, may not draw a line in the sand and prohibit public sexual acts.

United States Magistrate Judge Anthony R. Mautone conducted a non-jury trial on October 10, 2012. After hearing testimony from four witnesses and reviewing exhibits, he found Zombory guilty. Magistrate Judge Mautone imposed a sentence of two years' unsupervised probation, a two-year ban from Sandy Hook, a fine of $1000, a special assessment of $10, and a processing fee of $25. T 107.[1] Judgment was entered on October 18, 2012. Zombory filed a timely appeal to this Court. *See* 28 U.S.C. § 3402; Fed. R. Crim. P. 58(g)(2)(B); L. Crim. R. 58.1(d)(1).

## STANDARD OF REVIEW

"In all cases of conviction by a United States magistrate judge an appeal of right shall lie from the judgment of the magistrate judge to a judge of the

---

[1] The transcript of trial and sentencing, in one volume, is cited as "T_". The judgment is at Mag. No. 12-9303, Docket No. 2.

district court of the district in which the offense was committed." 28 U.S.C. § 3402; *see also* Fed. R. Crim. P. 58(g)(2)(B) ("A defendant may appeal a magistrate judge's judgment of conviction or sentence to a district judge within 14 days of its entry."); *United States v. Pethick*, 513 F.3d 1200, 1201 (10th Cir. 2008). "The scope of review upon appeal shall be the same as an appeal from a judgment of the District Court to the Third Circuit." L. Crim. R. 58.1(d)(1) (D.N.J.); *accord United States v. Jackson*, 2008 U.S. Dist. LEXIS 46179 (D.N.J. June 11, 2008).

The standard of review on appeal from a judgment of criminal conviction after a bench trial is well-settled. On appeal after a nonjury trial, this Court will apply "de novo review to the legal determinations made by the [Magistrate Judge] and review ... factual findings for clear error." *United States v. Solorzano*, Crim. 06-922 JBS, 2008 WL 5451040 (D.N.J. Dec. 30, 2008). Plenary, or *de novo*, review of legal matters requires little comment. Clearly-erroneous review, too, is a familiar standard when a judge's findings of fact are at issue.[2] *See United States v. Orgovan*, 377 F. App'x 227, 229 (3d Cir. 1010) (not precedential); *United States v. Delerme*, 457 F.2d 156, 160 (3d Cir. 1972). A finding is clearly erroneous when "the court is left with the definite and firm conviction that a mistake has been committed." *Krasnov v. Dinan*, 465 F.2d 1298, 1302 (3d Cir. 1972); *accord United States v. Howe*, 543 F.3d 128, 133 (3d Cir. 2008); *United States v. Igbonwa*, 120 F.3d 437, 440 (3d Cir. 1997). Under the clearly-erroneous standard, a judge's finding of fact must be upheld unless it "(1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data." *United States v. Antoon*, 933 F.2d 200, 204 (3d Cir. 1991) (quoting *Krasnov*, 465 F.2d at 1302).

In light of certain contentions at trial and on appeal, it is appropriate to emphasize this Court's limited role under the applicable standard of review. The defendant, Zombory, has protested that prosecution of his acts is unduly harsh, and that a conviction will hinder his plans to seek employment in the school system as a librarian. The importance of punishing lewd conduct on a nude beach through criminal prosecution or the wisdom of allocating scarce government resources to that pursuit are not for me to decide. Those are valid considerations, and the prosecutorial and investigative authorities should take them into account. I, however, cannot legitimately bend my analysis to accommodate those considerations. Indeed, it is irrelevant whether I, as finder of fact, would have reached the same result. The standard of review confines my deliberations here.

---

[2] This standard of review, while deferential, is more searching than review of a jury verdict, the standard for which is also cited by the government. *See, e.g., Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (court may reverse only if no rational trier of fact could have found guilt beyond a reasonable doubt based on the available evidence).

## FACTS

I summarize the pertinent testimony and exhibits, noting some conflicts in the evidence.

The events in question occurred between 3:00 and 3:30 p.m. on March 23, 2012, at Gunnison Beach, one of eight beaches at Sandy Hook. All agree that Gunnison is a clothing-optional beach.

Adam Hubert, an experienced park ranger, was on foot patrol on an access road, scanning the beach through binoculars. (T 7-8, 11). His observations, initially from a distance of approximately 70 yards (T 11), formed the basis for issuance of the summons that led to this prosecution. Hubert testified that he had a clear and unobstructed view. (T 14, 30-31).

Hubert saw the defendant, Thomas Zombory, and his fiancée sunbathing at Gunnison Beach. They sat side-by-side in beach chairs. Mr. Zombory was unclothed, and his fiancée may have been unclothed as well.[3] Both testified that they were facing west toward the dunes, *i.e.*, facing away from the ocean, and were partially sheltered by a wind screen.[4] It was an unusually warm day for March. (T 57, 64-65). There were other people walking around or seated on the beach with wind screens. (T 13-14).

Hubert, through his binoculars, watched Zombory and his fiancée for about five minutes. He timed that interval with his wrist watch, and

---

[3] Hubert believed that the fiancée might have been wearing a bathing suit. She testified that she was not, but may have had a sweat shirt over her shoulders. (T 13, 14, 65). The fiancée was not charged with anything, and this factual inconsistency is not directly relevant to any element of the offense.

[4] Hubert did not recall any such wind screen, but acknowledged that it was possible that it was there. (T 28). Photographs of the scene, which show the chairs and a wind screen, are not contemporaneous evidence; they are demonstrative representations that defendant set up and photographed some time later. (T 70-71; Exhibits D-2, D-5). In the pictures, the wind screen seems to be three-sided (or at least that it can be set up in that configuration). Its main face would block the view of defendant from the ocean side, *i.e.*, from behind. From the front, it would not obstruct the view at all, and it did not obstruct Hubert's view. (T 31, 88-89). There was no testimony as to the specific angle from which its side pieces might or might not have blocked a side view. The Magistrate Judge accepted the photographs in evidence, but gave them little weight; during summations he commented to defense counsel that he admitted this photographic evidence "in conjunction with the testimony of your client, which frankly, I didn't believe." (T 99).

3

intermittently took the binoculars away from his eyes. (T 12-13, 29). He saw Zombory tapping, grasping and then "stroking his penis in an up and down motion." (T11). Defendant's penis was at first "semi-erect," and then "fully erect." (T 11-12). Hubert did not see Zombory "itching" or "scratching" his penis. (T 18).

Meanwhile, Zombory's fiancée did nothing improper. To Hubert, she appeared to be talking to Zombory, "off and on." (T 14).

Hubert walked toward the beach, and toward Zombory. On the way he passed another man ("John Doe"), who was about 20 yards away from Zombory, looking in Zombory's direction and "grasping his penis with his left hand, stroking it." (T 16-17). Charges, if any, brought against "Doe" are not disclosed in the record.

Hubert then arrested Zombory for public lewdness and issued a violation notice. He had Zombory don his clothes, and then took Zombory to the Law Enforcement Division building for processing. During routine booking inquiries, Zombory mentioned a "medical condition" and said he had been displaying it to his companion. (T 19, 23). He stated that he was not on any medications. (T 22-23). Zombory protested that he had seen other people on the beach doing more serious things than he had done. (T23-24) Hubert inventoried Zombory's possessions, but did not recall seeing any medicine, cream or lotion. (T 26-27).

Zombory offered medical testimony from Dr. Taner Turkes. Turkes was not Zombory's treating physician. He had examined Zombory once, on August 29, 2012, some five months after the incident. He testified that Zombory had cystic acne, a condition that causes irresistible itching in the affected area "if there is a flare-up." Turkes did not see Zombory scratch, but observed scratch marks. Turkes testified that records showed that Zombory had been "seen by a doctor" for this condition as early as 2010. (T 34-39, 50). On cross-examination, Turkes said he did not know if this condition would have rendered Zombory incapable of masturbation (T 45), but that scratching would not cause an individual's penis to become erect (T 51). Turkes did not prescribe anything for the condition, but told Zombory to go to a dermatologist. (T 50).

Zombory's fiancée testified and corroborated his version of the events. She stated that she and Zombory had visited Gunnison Beach some 15 times. (T 56-59). She had been aware of Zombory's medical condition in the previous summer, but never saw him apply any medication. (T 62-63).

The fiancée testified that she and Zambory had been sitting side-by-side, facing the dunes, with a wind screen behind them to block the breeze from the ocean. She stated that Zombory had shown her his medical condition, and that

4

he was not masturbating. (T 53-55). She did not know whether he had an erection or not. (T 66).

Finally, the defense called Zombory himself to testify. Zombory testified to having suffered from cystic acne, and stated that it had erupted on March 23, 2012, causing him to touch it. He denied that he was masturbating at the time. (T 68-69, 77). He believed that the sun might be therapeutic for the condition. (T 79-80). Although he had consulted treating physicians, he had not taken medication of any kind. Surgical treatment was later proposed or performed (the record is somewhat unclear). (T 92).

Zombory allowed that scratching "could" cause an erection, but that it did not happen on this occasion. (T 82-83). He stated that he did immediately tell an arresting officer, apparently not Hubert, about his condition. (T 83). Cross-examination established that Zombory could resist the urge to itch, at least in social or professional contexts. (Zombory conceded that Doctor Turkes had perhaps "mischaracterized" the condition in this respect.) (T 84-86).

Zombory testified that he and his fiancée had been sitting facing a "forbidden dune area," where people are not permitted to walk. (T 71). They were some 20 yards east of a dune fence. (T 72). With respect to another photograph, he seemed to indicate that that the dune fence was 40, not 20, yards away. (T 73). There was undulating terrain, and surrounding vegetation. Zombory stated that he had thought the location was "private." (T 88) Zombory testified that he was unaware of "John Doe's" presence in the dune area until he stood up. (T 90).

**VERDICT AND SENTENCE**

In the course of entering a guilty verdict, the Magistrate Judge made a statement that summarized his factual findings.[5] I quote it in full:

> THE COURT: I sat here and listened to this case for hours. I observed every witness. And I can come to my conclusion, aided by those observations.
>
> When you address the trier of fact, as the dispenser of the law, in a charging situation in a criminal case, or even a civil case, you tell the jury that in coming to their determination as to who's telling the truth, you listen not only to the testimony that elicited from each witness, but you take into consideration their demeanor, what they say, how they say it, how they react to things.

---

[5] The Magistrate Judge also made comments and interjections during summation that may shed light on his conclusions, but this was his formal statement of the basis of the verdict.

5

> I observed the demeanor of all the witnesses, and I am completely comfortable in concluding, beyond a reasonable doubt, the truthfulness of the ranger when he say that he made these observations of your client palpating, stroking, however you want to characterize it, but using his left hand on his penis, to stimulate it to the point where it became erect. I have no doubt that that happened, certainly beyond a reasonable doubt I conclude that it happened.
>
> I have no doubt, at least not beyond a reasonable doubt that the government sustained its burden of proof, in convincing me, as the trier of fact, that in fact a lewd act occurred. I have certainly no problem concluding, beyond a reasonable doubt, that in addition to that lewd act having occurred, it occurred in such a place that was open to the public. And it's not that somebody did see him, the government doesn't have to prove that somebody did see him, in their presentation they satisfied me, as the trier of fact, that he was seeable, viewable. And so I'm convinced that the government sustained its burden of proof, beyond a reasonable doubt and I'll enter a finding of guilt.

(T 104-05).

The Magistrate Judge heard arguments of counsel and then imposed sentence as follows:

> I'm going to impose two years unsupervised probation. You can't return to Sandy Hook for two years. It'll be a $1,000 fine, and a $10 special assessment, and a $25 processing fee.

(T 107). Realizing that the defendant had not spoken, the Magistrate Judge permitted him to do so. Zombory essentially stated that he had not been guilty of anything except "[t]aking the sun, in the nude," and that a finding of guilt would have a harsh impact on his efforts to find employment. (T 107-09). The Magistrate Judge reasserted the sentence already imposed. (T 109, 111). The penalties, except for unsupervised probation, were stayed pending appeal. (T 110-11). This appeal followed.

## DISCUSSION

### I. Sufficiency of the Evidence to Establish the Elements of the Offense

The federal regulation that Zombory was found to have violated specifically applies to the Gateway National Recreation Area. It defines the offense of public lewdness as follows:

> Public lewdness. Section 245.00 of the New York Penal Code is hereby adopted and incorporate into the regulations of this part. Section 245.00 provides that: A person is guilty of public lewdness when he intentionally exposes the private and intimate parts of his body in a lewd manner or commits any other lewd act (a) in a public place....

36 C.F.R. § 7.29(c).[6] Because this CFR section explicitly borrows New York state law, the case law interpreting NYPL § 245.00 is pertinent and will be consulted by the federal courts for guidance. *See United States v. Doe*, 884 F. Supp. 78, 82 (E.D.N.Y. 1995).[7]

On that score, Zombory cites *People v. Gilbert*, 72 Misc. 2d 75, 338 N.Y.S.2d 457 (N.Y. City Crim. Ct., Kings Co. 1972), for the proposition that a violation of NYPL § 245.00 has four essential elements, *i.e.*, that defendant did

(1) intentionally,
(2) in a public place,
(3) expose the private or intimate parts of [his] body,
(4) in a lewd manner or commit any other lewd act.

72 Misc. 2d at 77 (line breaks added).

---

[6] The reference in the text of 36 C.F.R. § 7.29(c), as the parties agree, is obviously to Section 245.00 of the New York Penal Law ("NYPL"). The portion omitted from the quotation goes on to provide "or (b) in private premises under circumstances in which he may readily be observed from either a public place or from other private premises, and with intent that he be so observed." This prosecution proceeded under subsection (a), and the government concedes that subsection (b) does not apply.

[7] This explicit incorporation of New York law presumably was done as a convenience, perhaps because part of the Gateway National Recreation Area is in New York, or perhaps because New York was an early adopter of the Model Penal Code. The offense took place on federal land within the borders of New Jersey.

### A. Lewd Act

Zambory first contends that there was insufficient evidence to support the Magistrate Judge's finding that he exposed himself in a lewd manner or committed a "lewd act." His acts, he says, were "wholly consistent with his innocence, and wholly inconsistent with his guilt, in that he was in discomfort, and reacting to the negative effects of a medical condition...." The trouble with this contention is that it ignores the standard of review and requires this Court to disregard very substantial evidence that the Magistrate Judge was entitled to, and did, credit.

Zambory concedes, citing *Gilbert,* that the definition of "lewd" encompasses "sexual impurity or incontinence carried on in a wanton manner" or acts "characterized by lust; lustful; carnal; licentious." 72 Misc. 2d at 77 (dictionary citations omitted). And he does not seriously contest that public masturbation, even through clothing, is "lewd" conduct:

> [D]efendant's actions of repeatedly stroking his covered erect penis in public, in addition to rubbing his covered erect penis against the buttocks of three females, in public, is exactly the kind of behavior which the Legislature intended to encompass by utilizing the phrase "any other lewd act" in the context of § 245.00. While the defendant's acts involved no actual exposure of the genitals, they are analogous and fall within the same kind or category of act directing the public's attention to the genital area. An erect penis has been ruled an indication of sexual activity. *People v. Clark,* 60 Misc. 2d 1073, 1074, 304 N.Y.S.2d 326 (Crim. Ct., N.Y.Co., 1969).

*People v. Darryl M.,* 123 Misc. 2d 723, 726, 475 N.Y.S.2d 704 (N.Y. City Crim. Ct.1984). *See also People v. Horner,* 300 A.D.2d 841, 843, 752 N.Y.S.2d 147 (3d Dep't 2002).

Of course it is true that mere nudity, and perhaps a bit more, is not lewd. "Nudity in itself and without lewdness or dirtiness is no obscenity in law or in common sense." *Matter of Excelsior Pictures Corp. v. Regent of Univ. of State of N.Y.,* 3 N.Y.2d 237, 242, 144 N.E.2d 31, 165 N.Y.S.2d 42 (1957). Thus in *Gilbert,* the court found no violation of NYPL § 245.00 where a nude and apparently uninhibited defendant had sunned herself, applied suntan lotion to her breasts, and generally frolicked before clothed onlookers on a public beach.

Zombory would characterize his conduct as nude, not lewd. He does not deny that public masturbation is lewd; rather, he contends that it did not occur, because his acts were of another character. That is where he runs afoul

of the clearly-erroneous standard of review, summarized above.[8] To be sure, he introduced evidence that the inspiration for his actions was medical, not masturbatory, and that he had merely scratched an itch, not gratified himself to the point of erection. But there was ample evidence to the contrary. The park ranger, Hubert, watched for five minutes. What he saw involved Zombory "stroking his penis in an up and down motion," resulting in a partial, then a full, erection. (T 11-12)

The Magistrate Judge credited Hubert's testimony—he referred specifically to the "truthfulness of the ranger"— and stated that he frankly did not believe Zombory. (T 104. *See also* T 99). His finding that a lewd act occurred has ample support in the record. It does not approach the necessary threshold for reversal, *i.e.*, that it be "devoid of minimum evidentiary support" or bear "no rational relationship" to the underlying evidence. *United States v. Antoon*, 933 F.2d at 204. This aspect of the findings must be upheld.

**B. Public Place**

Zombory next contends that, as a matter of law, the evidence was insufficient to support a finding that his acts were committed in "a public place." Here, the evidence is more evenly balanced, but again is sufficient to support a finding that the defendant was in a "public place" as a matter of law.

Any interpretation of a "public place" for purposes of NYPL § 245.00 must start from the New York Court of Appeals' decision in *People v. McNamara*, 78 N.Y.2d 626, 585 N.E.2d 788, 578 N.Y.S.2d 476 (1991). *McNamara* rejected a *per se* rule that any place within the boundaries of a public park is necessarily "public." It also found defendant's intent to be irrelevant to the definition of a public place, which must be defined in relation to the unsuspecting or non-consenting viewer. 78 N.Y.2d at 631. *McNamara* adopted a totality-of-the-circumstances approach: A place is considered public "when the objective circumstances establish that the lewd acts committed there can and likely would be seen by the casual passerby." *Id.* at 633-34. *McNamara* does not require that defendant *be* seen; only that he be in a *place* where he could and likely would be seen.

---

[8] Zombory prominently quotes a portion of the *Gilbert* court's statement of the reasonable-doubt standard under New York law. *See* Def. Br. at 6, 8 (evidence must exclude every other reasonable possibility than guilt, must all be consistent with, and point to, guilt, and must be inconsistent with innocence). That must not be confused with this Court's standard of review on appeal. True, the substantive criminal offense is borrowed from New York law. In federal court, however, the standard of review on appeal from this criminal conviction is plenary as to legal matters, clear error as to the facts. *See* pp. 1-2, *supra*.

9

An instructive application of the *McNamara* standard is *United States v. Doe*, 884 F. Supp. 78 (E.D.N.Y. 1995). In *Doe*, the defendant was charged with public lewdness after engaging in oral sex with another man in the Gateway National Recreation Area. The park was not crowded; the investigating ranger saw only five people there the entire evening. The incident occurred at about 8:45 p.m., well after dark in April. The participants were well concealed in dense shrubbery, 50 feet from a parking lot and over 10 feet from a lighted bike path. The location could not be seen from the path; even during daylight the area was apparently dark and shrouded in shrubbery. There was no evidence that the men could have been seen by anyone; the investigating ranger saw them only because he penetrated the dense shrubbery on a mission to find evidence of "homosexual behavior"[9] or drug activity. *Id.* at 82. In short, these participants were hiding. Based on all of those circumstances, the district judge found that the evidence (which was undisputed) failed to establish that the defendant's acts occurred in a "public place," and he reversed the conviction. *Id.* at 82-83.

Magistrate Judge Mautone found as a fact that the portion of Gunnison Beach where Zombory sat was a "public place," under all the circumstances: "[I]t's not that somebody did see him, the government doesn't have to prove that somebody did see him, in their presentation they satisfied me, as the trier of fact, that he was seeable, viewable." (T 105). In so finding, he observed the proper legal standard.[10] In particular, the Magistrate Judge required that Zombory have been viewable, if not actually viewed, by persons on the beach. He did not he improperly rely on the fact that Zombory happened to be visible from afar to a ranger scanning the area with field glasses. As dictated by *McNamara*, the Magistrate Judge focused on the issue of whether Zombory sat in a location where he could be considered "seeable, viewable" by persons other than the investigator, under all the circumstances.

Those circumstances were as follows. The setting of this offense was an open, public beach in broad daylight. The month was March, but it was unseasonably warm. The fine weather had attracted others, who walked or sat on the beach. The time was between 3 p.m. and 3:30 p.m. (not close to "sunset," as argued by Zombory). Zombory and his fiancée were seated facing away from the water. True, that implies that they were facing a dune area, as

---

[9] The opinion does not reveal—and I do not care to speculate—why the agenda of the plainclothes officer in *Doe* was to seek out "homosexual behavior" or "male homosexuals," as opposed to lewd or illegal activity in general. *See* 884 F. Supp. at 82-83. The record in this case, by contrast, contains no suggestion that Ranger Hubert was doing anything but his job, which was, in part, to investigate federal offenses in the Gateway National Recreation Area.

[10] Both sides cited and argued the relevant case law to the Magistrate Judge before he made his findings. *See, e.g.,* T 95, 102-03.

they testified, and the public is not invited to wander at large over the dunes. Zombory recreated the situation in photographs he took later for court purposes. The photographs place the beach chairs in the midst of tall beach grass, enveloped on three sides by a wind screen, which Ranger Hubert did not recall seeing. The Magistrate Judge accepted the photographic recreations in evidence, but frankly stated that, having observed the demeanor of the witnesses, he simply did not believe Zombory and that he would evaluate the photographic recreation in light of that.[11] In the photographs, the beach chairs are obscured grass, even from the front; if the ranger's testimony that he had a clear, unobstructed view is accepted, it is difficult to accept the photographs as an accurate recreation of the scene. The Magistrate Judge's resolution of this conflict was a permissible one in light of the evidence before him.

Even in Zombory's testimony, the wind screen permitted him to be seen from the front. We may even consider *arguendo* his contention, discounted by the court, that he would be visible only from a fenced dune area from which the public was excluded.[12] Nevertheless, there was a considerable stretch of open, public beach between his chair and the dune fence—something in the neighborhood of 20 to 40 yards. Nothing in the evidence indicated that a member of the public could or would not walk in that area of this public beach.

These circumstances, in combination, support the Magistrate Judge's finding that this was a public place. It does not fall within the non-public privacy zone defined by *McNamara* and *Doe*. Zombory's subjective opinion that his location was "private" is irrelevant as a matter of law under *McNamara*. People other than the investigating officer were present on the beach, not virtually absent as in *Doe*. Ranger Hubert, unlike the officer in *Doe*, observed Zombory in plain sight (albeit with the aid of binoculars); he approached Zombory, not by penetrating dense underbrush, but by walking from his observation point to a *more* public place, the beach. It was broad daylight, not a dark Sunday night, as in *Doe*. Even assuming there was a wind screen behind the chairs, it was at most a partial obstruction. Zombory was visible from the front, not concealed in a dense brushy hiding place like the one in *Doe*. Even in Zombory's account, some 20 to 40 yards of public beach

---

[11] "They [the photographs] were accepted by the Court in conjunction with the testimony of your client, which frankly, I didn't believe. And so therefore, I don't know where these photographs are, vis-à-vis—I don't know where the area shown in these photographs are, vis-à-vis the place where this actually happened. Because I don't believe him." (T 99)

[12] "John Doe" did find his way to an observation point, apparently in the dunes. Magistrate Judge Mautone's findings indicate that he gave "Doe's" presence minimal, if any, weight. Considering, but not finding, that he might have been a peeping Tom, operating from a position of concealment, I do the same. I do not intend to make any finding here that would be relevant to any proceeding involving "Doe."

separated him from the fenced dune area where the public was not invited to walk. In short, the *Doe* indicia of careful hiding and concealment are absent. A passerby on the beach could have observed Zombory. *A fortiori*, the evidence of purposeful concealment is not so overwhelming that, as in *Doe*, I could overturn the fact finder's conclusion.

This aspect of the Magistrate Judge's findings, too, must be upheld. And because both of Zombory's challenges fail, I will affirm his conviction as being based on sufficient evidence, viewed in light of the correct legal standard—neither clearly erroneous as to the facts, nor mistaken as to the law.

## II. Judicial Bias

Finally, Zombory argues that his conviction should be overturned because it is the product of judicial bias. That contention, based on stray comments and adverse rulings at trial, falls short of requiring reversal.

The applicable standard is similar to that for recusal. *See, e.g.*, 28 U.S.C. § 455. "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Selkridge v. United of Omaha Life Ins. Co.*, 360 F.3d 155, 167 (3d Cir. 2004) (citing *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147 (1994)).

Extra-judicial bias is not alleged here, and intra-judicial bias is quite difficult to establish. In the course of hearing evidence, a judge may form an opinion—especially in a bench trial, where it may be the judge's job to do so. The judge may even become ill-disposed toward the defendant. "But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task." *Liteky*, 510 U.S. at 551. Therefore, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Id.* at 555. And "[a] judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Id.* at 556.

Zombory objects to the Magistrate Judge's lumping him with "John Doe," an apparent peeping Tom, by calling Doe the "other offender." The implication is too weak to support a finding of serious prejudice, let alone "deep-seated antagonism." The Magistrate Judge, moreover, carefully noted that he would withhold further judgment on "Doe's" case unless and until it was before him. (T 16).

The Magistrate Judge *sua sponte* required the medical expert, Dr. Turkes, to surrender the file he had in his hand for the government attorney's inspection. It is common and routine in both criminal and civil cases, and is not an indicator of bias, to require a medical expert to show his chart—especially if, as appears to be the case, the expert has carried it with him to the witness stand. (T 48).

Zombory alleges that on two occasions the Magistrate Judge admonished him about rambling or inconsistent answers, and otherwise attempted to move the proceedings along, in a manner that betrayed exasperation or impatience. Once, the Magistrate Judge remarked that he had tried murder cases in less time—a hyperbolic comparison, to be sure, but not a serious attempt to link this offense with murder or to prevent Zombory from putting on his defense, which he had a fair opportunity to do. Again, these fairly innocuous examples of courtroom administration, with no jury present, do not rise to the level of error or bias.

Finally, Zombory finds it "most damning of all" that the Magistrate Judge accepted that there were sand dunes in the area but refused to accept the "fact" that Zombory was hidden. It does not ineluctably follow from the presence of sand dunes that this beach was not a public place. Resolving an evidentiary conflict against a defendant is not bias. For the reasons stated above, the Magistrate Judge's evident skepticism, and his findings, were grounded in the evidence of record.

Zombory's claim of bias does not surmount the standard for recusal, reassignment or reversal.

## CONCLUSION

I have examined this record carefully and applied the limited standard of review. I have reached the conclusion that there is no clear error as to the factual findings or error as to the law sufficient to require reversal of this verdict. Consequently, Judgment is **AFFIRMED**. An appropriate order will be filed with this opinion.

Dated: November 6, 2013
Newark, New Jersey

KEVIN MCNULTY
United States District Judge